IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

TIMOTHY B., MICHAEL M., *Appellants,*

*v.*

DEPARTMENT OF CHILD SAFETY, H.B., J.J., *Appellees.*

No. 1 CA-JV 20-0075
FILED 10-8-2020

Appeal from the Superior Court in Maricopa County
No. JD33713
The Honorable Michael D. Gordon, Judge

**AFFIRMED IN PART; VACATED IN PART; REMANDED**

COUNSEL

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant Timothy B.*

Vierling Law Offices, Phoenix
By Thomas A. Vierling
*Counsel for Appellant Michael M.*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee Department of Child Safety*

---

**OPINION**

Judge Lawrence F. Winthrop delivered the opinion of the Court, in which Presiding Judge Jennifer B. Campbell and Chief Judge Peter B. Swann joined.

---

**W I N T H R O P**, Judge:

**¶1**		Two natural fathers, Timothy B. ("Timothy") and Michael M. ("Michael"), appeal the juvenile court orders terminating their parental rights to their respective children with the same mother.  Both argue that the termination of their parental rights was not in the best interests of their children.  For the reasons set forth below, we affirm the juvenile court's best-interests finding and termination order as it relates to Michael, but vacate the court's best-interests finding and termination order as it relates to Timothy and remand for reconsideration.

**¶2**		Timothy also appeals the court's finding that the state met its burden in proving the statutory ground of length of incarceration under Arizona Revised Statutes ("A.R.S.") section 8-533(B)(4).  In that regard, we hold that, on this record, the juvenile court erred in strictly applying a narrow concept of "normal home" as outlined in an earlier decision of this court, *Maricopa County Juvenile Action No. JS-5609*, 149 Ariz. 573, 576 (App. 1986).  In that regard, we provide some guidance and remand this issue for the court to reconsider as well.

**FACTS AND PROCEDURAL HISTORY**

**¶3**		Michael and Jaliece J. ("Mother") are the natural parents of J.J., born January 2006.  In March 2010, Michael was arrested, and in January 2011, he was sentenced to four concurrent terms of imprisonment, the longest of which was 10 years.  J.J. was five years old at the time Michael was sentenced.  Before his arrest, Michael had spent some time caring for J.J., although that time was brief because of conflicts with Mother.  While incarcerated, however, Michael maintained contact with J.J. by mail through 2012, and by phone on and off through 2016.

**¶4**		Timothy and Mother are the natural parents of H.B., born September 2012.  In October 2013, Timothy was arrested and charged with multiple felonies.  In March 2015, he was convicted of four felonies and

sentenced to an aggregate of 12.5 years in prison and lifetime probation after his release. From the time she was born through her father's arrest, H.B. lived with her parents and some of Mother's other children; she moved in with Timothy's mother and sister when Timothy was incarcerated but continued to visit Mother and had frequent contact with Timothy.

¶5  The Department of Child Safety (the "Department") filed a petition for dependency as to Mother, Timothy, and Michael in January 2017. The petition addressed concerns for four children, including H.B. and J.J., and alleged Mother had been arrested[1] and she had neglected to provide for her children, abused substances, and was involved in domestic violence with another of her children's fathers. H.B. and J.J. were found dependent as to their respective fathers because, as noted above, each man was incarcerated. Shortly thereafter, the juvenile court granted the Department's request to place H.B. with a younger sibling in a qualified kinship placement with a friend of Mother's. The court granted the Department's request to place J.J. in the same placement a few months later.

¶6  After the dependency action was initiated, the Department facilitated two visits with Michael and J.J. in 2018, before the Department learned from prison officials that Michael's visitation privileges had been suspended. Michael also sent J.J. a few letters.

¶7  Timothy repeatedly requested visitation and phone calls with H.B., and eventually the Department supervised weekly phone calls and in-person visits once or twice a month. Timothy also frequently sent gifts and letters to H.B.

¶8  The court ordered all of the children returned to Mother in May 2018. Just six months later, however, the court again removed the children from Mother after her participation in Department services waned, she tested positive for cocaine, and the children's school attendance became "sporadic." The Department returned H.B. and J.J. to the kinship placement. The following month, the Department moved to terminate the parental rights of Mother, Timothy, and Michael.

¶9  After a five-day hearing, the juvenile court terminated the parental rights of Mother, Timothy, and Michael to their respective

---

[1]  The record indicates Mother was arrested for outstanding warrants and served nine days in jail.

children.[2]  Timothy and Michael timely appeal, and we have jurisdiction pursuant to A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

**ANALYSIS**

**¶10**　　　　Natural parents have fundamental rights to the care and custody of their children and to associate with them. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Maricopa Cnty. Juv. Action No. JD-5312*, 178 Ariz. 372, 374 (App. 1994).  These fundamental rights do "not evaporate simply because" the parents "have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 754 (1982); *see JD-5312*, 178 Ariz. at 374.  But these rights are not absolute, and the juvenile court may terminate a parent's relationship with his or her child under certain circumstances. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24 (2005).  Termination of a parent-child relationship constitutes a severe and permanent consequence that the juvenile court should order "only in the most extraordinary circumstances, when all other efforts to preserve the relationship have failed." *Maricopa Cnty. Juv. Action No. JA 33794*, 171 Ariz. 90, 91-92 (App. 1991); *see Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 4 (1990) ("[T]ermination of parental rights is not favored and . . . it generally should be considered only as a last resort.").  Once a juvenile court has terminated a parent-child relationship, the natural parent loses not just the right to care and custody of the child, but the right to associate with or even contact the child. *See JD-5312*, 178 Ariz. at 374-75; *Maricopa Cnty. Juv. Action No. JS-6831*, 155 Ariz. 556, 559 (App. 1988).

**¶11**　　　　To terminate a parent-child relationship, the juvenile court must find by clear and convincing evidence at least one of the statutory grounds set forth in A.R.S. § 8-533(B). *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 377, ¶ 15 (App. 2010).  The court must also find by a preponderance of the evidence that termination of the parental relationship is in the child's best interests. *Id.*  We review *de novo* the court's interpretation of relevant statutes and will not disturb its decision absent an abuse of discretion or unless no reasonable evidence supports its findings of fact. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47,

---

[2]　　　　Mother is not a party to this appeal, and our decision does not affect the juvenile court's ruling terminating her parental rights.  The juvenile court also denied Timothy's motion to change physical custody, in which he requested H.B. be placed with her paternal aunt.  He does not challenge this decision on appeal.

¶¶ 8, 9 (App. 2004). "[T]his court will not reweigh the evidence but will look only to determine if there is evidence to sustain the court's ruling." *Id.*

      I.      *Termination Pursuant to A.R.S. § 8-533(B)(4)*

**¶12** The juvenile court terminated Timothy and Michael's respective parental rights on the length-of-incarceration ground. *See* A.R.S. § 8-533(B)(4). On appeal, only Timothy challenges the court's ruling on the ground for termination.

**¶13** On this ground, the Department bore the burden to establish by clear and convincing evidence that Timothy "is deprived of civil liberties due to the conviction of a felony" and that "the sentence . . . is of such length that [H.B.] will be deprived of a normal home for a period of years." A.R.S. § 8-533(B)(4). Timothy does not dispute that he has been deprived of his civil liberties due to a felony conviction, so we address only whether reasonable evidence supports the court's finding that H.B. will be deprived of a normal home for a period of years. As discussed in more detail below, the statute does not provide any guidance about the meaning of the requisite "period of years" or what constitutes a "normal home."

**¶14** As we review the juvenile court's analysis and decision, we keep in mind the primary historical purpose of the statute, which has been to protect the health and safety of children through expediting "the adoption of numerous children who remain in temporary foster care for indeterminate lengths of time with no hope of being returned to their natural parents and, in so doing, promote a stable and long-term family environment for these children." *James S. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 351, 356, ¶ 18 (App. 1998) (quoting Act of 1986, ch. 205, § 1, 1986 Ariz. Sess. Laws); *see E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 59, ¶ 14 (App. 2015).

**¶15** The Arizona Supreme Court has acknowledged that A.R.S. § 8-533(B)(4) "sets out no 'bright line'" as to when a parent's sentence satisfies the standard for termination. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251, ¶ 29 (2000). Underscoring the fact-specific nature of this inquiry, the court noted that even a twenty-year sentence "might not provide sufficient basis for severing an incarcerated parent's rights." *Id.* To assist courts in navigating the "vague language"[3] of the statute (and to

---

3     *Public Welfare Services for Children and Youth in Arizona: A Special Report Prepared for the Arizona Legislative Council, Interim Committee on Health and Welfare* D-13 (1970) (referring to H.B. 13, 29th Leg., 2d Reg. Sess. (1970),

prevent incarceration from becoming a *per se* ground for severance), the supreme court set forth six factors to consider:

> (1) the length and strength of any parent-child relationship existing when incarceration begins, (2) the degree to which the parent-child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the relationship between the child's age and the likelihood that incarceration will deprive the child of a normal home, (4) the length of the sentence, (5) the availability of another parent to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue.

*Id.* at 251-52, ¶ 29. The juvenile court should consider these non-exclusive factors and all other relevant factors as part of the termination inquiry. *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 450, ¶ 15 (App. 2007). Although the juvenile court is not required to list each factual finding on the record for each of the factors, a lack of evidence on one or more relevant factors may or may not require the reversal or remand of a termination order. *Id.* at 450, 451-52, ¶¶ 15, 19.

¶16 Here, the juvenile court made specific findings as to the first five *Michael J.* factors and concluded those factors weighed in favor of terminating Timothy's parental rights. Timothy argues that the court erred in relying on the "outdated definition" of "normal home" found in *Maricopa County Juvenile Action No. JS-5609*, which states that the use of the term in A.R.S. § 8-533(B)(4) "relates to respondent's obligation to provide a normal home, a home in which the respondent natural father has a presence" and does not refer to a "normal home environment" created by others. 149 Ariz. at 575 (internal quotations omitted). That definition, Timothy contends, was created fourteen years before the Arizona Supreme Court set forth the *Michael J.* factors, and its continued application "essentially neuter[s]" the supreme court's intent to provide a more global view and comprehensive assessment of the parent-child relationship at issue.

¶17 To illustrate his argument, Timothy points to the juvenile court's findings here that he had made "extraordinary" and "laudable" efforts to maintain and nurture his relationship with H.B., notwithstanding the barriers created by his incarceration. Despite finding "[t]here is no question that [Timothy] has done all he can to maintain and nurture his

---

enacted as A.R.S. § 8-533), https://azmemory.azlibrary.gov/digital/collection/statepubs/id/33490/rec/1.

relationship with [H.B.]," the court then suggested those efforts did "not translate into [H.B.] receiving all she *needs* from a parent." The court found that Timothy's imprisonment "has proven to be too great an obstacle to overcome in his attempt" to provide a normal home for H.B. "particularly because there is no parent available," given that the court terminated Mother's rights to H.B. as well. Elaborating on what it considered to be a "normal home," the juvenile court found that H.B. "has no parent available to walk her to school, to teach her how to ride a bicycle, go to school functions and help with homework on a regular basis."

¶18 Although ideally, a natural parent is available to take on daily responsibilities like those the juvenile court cited, many modern parents who are not considered "unfit" are often personally unable to do so, including parents on military deployment, single working parents, chronically ill parents, or parents attending higher education programs. While we do not agree with Timothy that the *Michael J.* factors are necessarily "neutered" by the juvenile court's continuing to consider the definition of "normal home" in *JS-5609*, we agree that a less rigid definition may be appropriate and the juvenile court should have the discretion to consider that a "normal home" may include a parent with a non-traditional presence. *Cf. Pima Cnty. Juv. Action No. S-114487*, 179 Ariz. 86, 97 (1994) ("When . . . circumstances prevent the . . . father from exercising traditional methods of bonding with his child, he must act persistently to establish the relationship however possible and must vigorously assert his legal rights to the extent necessary."); *Roberto F. v. Ariz. Dep't of Econ. Sec.*, 232 Ariz. 45, 55, ¶ 42 (App. 2013) ("In any severance proceeding, the material issue facing the court is whether a parent has the ability to properly parent his/her child; it is irrelevant whether a child has a stronger attachment to [the foster placement], whether [such placement is] more 'nurturing,' or whether [the placement] might be more capable or better parents than a natural parent.").

¶19 The Department counters that Timothy's argument "implicitly invites this Court to hold that sympathy for an incarcerated parent who makes sincere but necessarily inadequate efforts should trump the other relevant" *Michael J.* factors. To accept Timothy's argument, the Department contends, would risk "rewrit[ing] the statutory ground to dictate a result based on sympathy for an incarcerated parent." We disagree. Our concern is not driven by "sympathy" but is rather designed to ensure the juvenile court does not unintentionally impinge on an individual's constitutional rights to a parental relationship with his or her child based on a potentially outmoded or rigid concept of parenthood or a "normal home." Because, as discussed below, we remand Timothy's case

for reconsideration of the court's best-interests finding, we also direct the juvenile court to reconsider whether the Department has proven by clear and convincing evidence that he is an unfit parent without relying entirely on the narrow parameters of a "normal home" as set forth in *Maricopa County Juvenile Action No. JS-5609*. This directive, however, should not be construed as any opinion as to how the juvenile court should rule on that issue.

### II.    *Best Interests*

**¶20**    Once the court finds a ground for termination by clear and convincing evidence, the court must consider whether termination of the parent-child relationship is in the best interests of the child. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 15 (2016). At this stage, the court balances the interests of the natural parent and the child:

> In a best interests inquiry, however, we can presume that the interests of the parent and child diverge because the court has already found the existence of one of the statutory grounds for termination by clear and convincing evidence. Thus, while a parent already found unfit maintains some interest in the care and custody of his or her child, the court's determination that statutory grounds for severance of parental rights exist substantially reduces the importance of this interest. In considering the best interests of the child, the court must balance this diluted parental interest against the independent and often adverse interests of the child in a safe and stable home life.

*Kent K.*, 210 Ariz. at 286, ¶ 35 (internal citations omitted). Generally speaking, termination may be in the best interests of the child if the child will benefit from termination or if the child will face harm if the relationship continued. *Demetrius L.*, 239 Ariz. at 4, ¶ 16. Although in many situations, "the presence of a statutory ground [for termination] will have a negative effect" on a child, "in some cases, this will not be true." *JS-6831*, 155 Ariz. at 559. Therefore, the best-interests analysis requires the court to "evaluate the totality of circumstances," which may include the bond between the natural parent and the child, the availability of a prospective adoptive placement, risk for abuse or neglect if the relationship is not terminated, and placement with siblings. *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98-99, ¶¶ 10, 12 (App. 2016); *see Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 378, ¶ 6 (App. 1998).

**¶21**    In finding that the termination of Timothy's and Michael's parent-child relationships was in the best interests of their respective children,[4] the juvenile court cited *Kent K.* for the proposition that "[t]he focus is now *solely* on the children's best interest as distinct from those of the parent." (Emphasis added.)  But our supreme court did not establish such a standard.  Indeed, that case requires the juvenile court to balance the interests of *both* the child and the parent, as even "a parent already found unfit maintains some interest in the care and custody" of his child.  *Kent K.*, 210 Ariz. at 286, ¶ 35.  Although the interests of the children must remain "paramount" to those of the parent, the juvenile court may not entirely ignore the parent's interest.  *See A.R. v. Dep't of Child Safety*, 246 Ariz. 402, 406-07, ¶ 13 (App. 2019).

**¶22**    As to Timothy, the evidence on this record does not support a finding that termination of his relationship to H.B. is in the best interests of the child.  As the court found, "[H.B.] loves her Father very, very much."  The Department child safety specialist testified that H.B. was happy to speak to Timothy in phone calls and happy to see him on visits, during which Timothy helped H.B. with homework, encouraged her to practice positive social skills, and showed "genuine interest and affection."  The specialist also testified that "it would hurt [H.B.] to not have contact with her father" and "[i]f the relationship stopped, as far as . . . communication, her ability to see and talk to her dad, yes, it would hurt."  In fact, the specialist acknowledged that H.B. sometimes cries at night because she misses her father.  And although the court found "it is likely that current placement will continue to facilitate maintenance of their relationship,"[5]

---

[4]    The juvenile court combined the best-interests analysis related to J.J. and H.B. under A.R.S. § 8-533 with the analysis related to Timothy's pending motion to change physical custody.  Although not inherently problematic, the overlapping of the court's analyses of the two issues complicates our review somewhat, particularly because, although the court indicates it is addressing Timothy's motion, it refers to the best-interests analysis standard set forth by *Kent K.*, which does not address the issue of placement.  Thus, the order is not entirely clear which findings relate to the best-interests analysis for H.B pursuant to termination or to the physical custody of H.B. pursuant to Timothy's motion.

[5]    The Department specialist testified that H.B.'s current placement had previously been unwilling "to even supervise H.B.'s phone calls, she wasn't really willing to supervise any phone calls for the children.  So [utilizing] the case aide was the only way that we could get visits [to the children's fathers] or anything in place."

once the relationship is terminated, neither Timothy nor H.B. will have any legal right to contact the other. *See Titus S. v. Dep't of Child Safety*, 244 Ariz. 365, 372, ¶ 29 (App. 2018) ("[Termination] permanently severs [children's] relationship to their biological father."). The juvenile court cited H.B.'s adoptability and prospective adoptive placement to support its best-interests finding, but we hold the court is not "free to disregard other evidence regarding a child's best interests," including evidence related to the parent's interest in continuing the relationship. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 13 (2018). We therefore vacate the juvenile court's finding that termination of the parent-child relationship is in the best interests of H.B. and remand for reconsideration that includes a proper balancing of H.B.'s and Timothy's respective interests. Again, our order in this regard should not be construed as any indication as to how the juvenile court should rule on this issue.

**¶23**       As to the best interests of J.J., Michael argues the court did not give sufficient weight to his efforts to rehabilitate himself and the bond between him and J.J. We do not reweigh evidence on appeal. *A.R.*, 246 Ariz. at 407, ¶ 16. As we previously noted, the juvenile court applied the incorrect standard in the best-interests analysis, and thus it is unclear from the record whether the court properly considered Michael's rehabilitative efforts or other factors related to his admittedly diminished interests. Regardless of this error, however, sufficient evidence supports the court's finding that termination is in J.J.'s best interests. Importantly, J.J., now fourteen years of age, consented to adoption at the time of trial, *see* A.R.S. § 8-106(A)(3), and, contrary to evidence regarding H.B., the record shows J.J. "struggle[s] with the idea of permanency," conversations about her placement cause her anxiety, and she requires additional support in school. As the juvenile court found, J.J.'s current placement is meeting her needs and is willing to adopt J.J. Thus, on this record, we affirm the court's finding that termination of the parent-child relationship is in the child's best interests.

**CONCLUSION**

**¶24** For the foregoing reasons, we affirm the juvenile court's order terminating the parent-child relationship as to Michael, but vacate the order terminating the parent-child relationship as to Timothy and remand for further proceedings consistent with this decision.

